22CA1304 Peo v Hernandez Flores 09-19-2024

COLORADO COURT OF APPEALS

---

Court of Appeals No. 22CA1304
Jefferson County District Court No. 21CR590
Honorable Robert Lochary, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Modesto Hernandez Flores,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division III
Opinion by JUDGE NAVARRO
Dunn and Gomez, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced September 19, 2024

---

Philip J. Weiser, Attorney General, Katharine Gillespie, Senior Assistant
Attorney General, Denver, Colorado, for Plaintiff-Appellee

The Noble Law Firm LLC, Antony Noble, Jennifer Tuttle, Lakewood, Colorado,
for Defendant-Appellant

¶ 1    Defendant, Modesto Hernandez Flores,[1] appeals the judgment of conviction entered on a jury verdict finding him guilty of sexual assault on a child by a person in a position of trust.  We affirm.

## I.    Factual and Procedural History

¶ 2    In January 2021, S.C. and her mother lived with Flores after her mother had separated from S.C.'s father.  Around this time, S.C., who was about twelve years old, began visiting her father on weekends.  During a visit, S.C. told her father that Flores had sexually assaulted her when she was about seven years old.  S.C. recalled that, around the time of the assault, she remembered wearing a "sunflower dress" and that the assault occurred around a holiday.

¶ 3    Based on S.C.'s initial description of the assault, the prosecution charged Flores with sexual assault on a child by one in a position of trust.  The complaint initially alleged that the assault occurred around Thanksgiving 2015; however, after S.C.'s family found photos of her wearing the sunflower dress, the prosecution amended the complaint to allege that the assault occurred between

---

[1] Because defendant refers to himself as "Flores" in his appellate briefs, we do the same going forward.

Easter 2014 and Thanksgiving 2015 (April 1, 2014, to November 30, 2015). A jury convicted Flores as charged.

¶ 4    On appeal, Flores contends that the trial court erred by (1) permitting prosecution witnesses to improperly bolster S.C.'s credibility and (2) allowing prosecutorial misconduct.

## II.    Witness Testimony

¶ 5    We first reject Flores's contention that the trial court committed reversible error by permitting witnesses to tacitly testify that S.C. was telling the truth about the incident.

### A.    Standard of Review

¶ 6    We review for an abuse of discretion a trial court's decision to admit evidence. *Venalonzo v. People*, 2017 CO 9, ¶ 15. A trial court abuses its discretion "when its ruling is manifestly arbitrary, unreasonable, or unfair, or when it misconstrues or misapplies the law." *People v. Williams*, 2016 COA 48, ¶ 18, *aff'd*, 2020 CO 78. Where, as here, a defendant fails to preserve an appellate claim by objection in the trial court, we will reverse the judgment only if plain error occurs. *See Hagos v. People*, 2012 CO 63, ¶ 14. An error is plain if it is obvious and so undermined the fundamental

fairness of a trial as to cast serious doubt on the reliability of the conviction. *People v. Walker*, 2022 COA 15, ¶ 28.

## B.    Expert Testimony

¶ 7    Flores argues that the court erred by admitting generalized expert testimony about the behaviors of child victims of sexual assault[2] as well as expert testimony about S.C.'s forensic interview.

¶ 8    "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." CRE 702. Expert testimony "is that which goes beyond the realm of common experience and requires experience, skills, or knowledge that the ordinary person would not have." *Venalonzo*, ¶ 22. Generalized expert testimony is permissible if the testimony "has a sufficient logical connection to the factual issues to be helpful to the jury while still clearing the

---

[2] Generalized expert testimony is that given by an expert witness who knows little or nothing about the facts of the case and has not examined the victim or the defendant. *See People v. Yachik*, 2020 COA 100, ¶ 49 n.5; *People v. Cooper*, 2021 CO 69, ¶ 1 n.1.

ever-present CRE 403 admissibility bar." *People v. Cooper*, 2021 CO 69, ¶ 3.

¶ 9     But no witnesses, not even expert witnesses, may testify that "another witness is telling the truth on a particular occasion." *Venalonzo*, ¶ 32. "This rule applies to both direct and indirect implications of a [witness's] truthfulness" because of "the possibility that it will improperly invade the province of the fact-finder." *Id.*

¶ 10    Without running afoul of this principle, however, "'[a]n expert may testify as to the typical demeanor and behavioral traits displayed by a sexually abused child' . . . because it assists the jury in understanding the victim's behavior after the incident — why the victim acted the way he or she did." *People v. Relaford*, 2016 COA 99, ¶ 28 (quoting *People v. Mintz*, 165 P.3d 829, 831 (Colo. App. 2007)). This type of expert testimony helps the jury understand the "typicality of reactions by [children] who have been subjected to sexual abuse that might, under other circumstances, be considered bizarre." *People v. Short*, 2018 COA 47, ¶ 13 (citation omitted).

¶ 11    This type of evidence is permissible because it "(1) relates to an issue apart from credibility and (2) only incidentally tends to corroborate a witness's testimony." *Relaford*, ¶ 31 (quoting *People*

*v. Cernazanu*, 2015 COA 122, ¶ 20).  "This evidence does not say whether the child was or was not lying on a specific occasion; instead, it explains why a jury should not necessarily disbelieve a child because of circumstances that, in a different context, would discredit the child's story."  *Short*, ¶ 14; *see People v. Whitman*, 205 P.3d 371, 383 (Colo. App. 2007).  Such information provides "a relevant insight into the puzzling aspects of the child's conduct and demeanor which the jury could not otherwise bring to its evaluation."  *Short*, ¶ 14 (citation omitted).

### 1.    Testimony of Beth Peters

¶ 12    At trial, the prosecution offered Beth Peters as a child psychology expert in the areas of "sexual assault behavior, dynamics and response of victims."  Defense counsel did not object, and the trial court qualified Peters as an expert in the identified areas.  Peters testified that she did not know S.C. or her family and that she had not reviewed any documents related to the case.

¶ 13    Peters said she knew of the "very basic demographics" of the situation: "the general part of development that the child was in when the abuse . . . allegedly occurred," there was a delay in disclosure, "the family experienced divorce," and the family "might

be" of Hispanic or Latin background. Peters explained that it was important to know this information because children of different ages respond differently and have different brain development. She also testified that cultural background can play a role in a child's decision to disclose abuse (or refrain from doing so) as well as a family's reaction to such an allegation.

¶ 14     Peters testified that about twenty-five percent of her practice involves Hispanic families and that, in her experience, "there are sometimes pressures for the victim to not tell, because there is a belief that adults are in charge and children are subordinate." Peters also said that girls in particular are "often viewed as possessions of the parents or adults around them." She clarified, however, that she was not offering an observation about the facts of this particular case; instead, she was making a "generalization."

¶ 15     Peters then discussed how children often delay reporting sexual assault. She testified that "[o]ver [seventy] percent of children do not tell right away. Many of them wait until they're adults." Discussing why children might delay, Peters told the jury that children are often "really afraid to tell" others about an incident because they do not want to upset people. She said that "[fifty]

percent of the time that's the case.  The person doesn't believe them . . . ."

¶ 16    Peters also opined that sexual abuse is more frequent "among divorced families" but is "often not investigated."

¶ 17    Finally, Peters testified that children are frequently blamed for the abuse.  Therefore, "they're more likely to say, no, no nothing happened.  I'm okay, I'm okay, than they are to say, oh, yeah, this happened, and be lying about it.  It's extremely rare in my experience and in the research."

¶ 18    As to all but Peters's last comment, we do not discern error, much less obvious error.  And we conclude that her last comment does not require reversal.

¶ 19    First, we discern no error in the court permitting Peters to testify generally concerning her experiences with Hispanic families, especially absent a defense objection.  This testimony was relevant to help contextualize S.C.'s delayed accusations.  Also, Flores premised his defense, in part, on his theory that her accusations resulted from her father's coaching or suggestions.  In support, Flores called multiple family members who testified that they did not believe he committed the crime.  Peters's testimony generally

discussing her experience working with Hispanic families and how culture may impact family dynamics was relevant to assessing Flores's defense.  That is, Peters's testimony provided the jury with a possible explanation for why some members of Flores's family might believe him over S.C.  *See Cooper*, ¶ 52 (noting generalized expert testimony is permissible if there is a sufficient logical connection to the factual issues to be helpful to the jury); *see also People v. Thompson*, 2017 COA 56, ¶¶ 170-171 (permitting expert testimony discussing barriers to disclosure, such as familial relationships and familial cultures).  Peters did not testify, directly or by implication, that S.C. was telling the truth about the abuse allegation or that Peters believed S.C.  *See Thompson*, ¶¶ 172-173.

¶ 20    Second, the trial court did not abuse its discretion by permitting Peters to testify to the occurrence of delayed disclosure by child victims of sexual abuse.  Colorado courts have consistently recognized that this form of generalized expert testimony is admissible because it aids the jury in understanding the victim's potentially counterintuitive behavior.  *See Cooper*, ¶¶ 72, 97 (upholding admission of expert testimony educating the jurors on matters about which they likely lacked knowledge or insight

8

because "any bolstering effect it may have had on [the victim's] credibility was incidental and acceptable"); *see also Relaford*, ¶ 28 (generalized expert testimony regarding the *typical* demeanor and behavioral traits displayed by a sexually abused child is usually admissible).

¶ 21    Although Peters testified that over seventy percent of children "do not tell right away," she did not testify that a child who delays reporting must be telling the truth. Rather, Peters's testimony explained that a factor that might normally cause a fact finder to disbelieve an accuser's claim (delay in reporting) might not be decisive in assessing the accuser's credibility in this context. Of course, the jury retained the prerogative to disbelieve S.C. because of the delay or for any other reason. The court instructed the jurors that they could reject an expert's testimony. And, given the Colorado case law permitting testimony similar to that admitted here, we cannot say the trial court committed obvious error.

¶ 22    Third, the court did not abuse its discretion by admitting Peters's testimony that, when a child reports abuse, fifty percent of the time they are not believed. This testimony about *other people's*

reaction to a report of abuse did not reasonably assert or imply that a child who reports abuse must be telling the truth.

¶ 23    Fourth, we do not see reversible error in the court's admitting Peters's statements regarding sexual abuse among divorced families because Flores invited any error. *See People v. Wittrein*, 221 P.3d 1076, 1082 (Colo. 2009) (explaining that a party may not complain of an error that they have invited or injected into the case; they must abide the consequences of their acts). On recross-examination, defense counsel asked Peters if, "in studies on false allegations, those tend to be part of either, like a custody dispute or contested divorce situation." Peters responded that false allegations are "definitely more frequent in those cases." Immediately afterward, she testified that "sexual abuse is also more frequent among divorced families" and that child protective services might not investigate a claim of sexual abuse in a high-conflict divorce because they may assume that "it's one adult accusing another." Because an investigation occurred here, Flores argues that this statement indicated that S.C. was telling the truth.

¶ 24    The challenged testimony was strategically elicited by defense counsel because it was a foreseeable result of counsel's question.

*See id.* By asking Peters about the credibility of child sexual abuse allegations in divorced families, Flores invited Peters's testimony on that topic. And, on appeal, Flores does not argue that Peters's testimony at issue was unforeseeable. Instead, he acknowledges that, in the challenged testimony, Peters "qualified her answer" to defense counsel's question. Because Flores invited the alleged error, we will not consider it further.

¶ 25 Finally, we agree with Flores that it was error to admit Peters's testimony that a child's lying about sexual abuse is "extremely rare." *See, e.g., People v. Marx*, 2019 COA 138, ¶¶ 8, 20-21. We conclude, however, that this brief testimony was not so substantial and damaging as to require reversal under the plain error standard. The prosecutor did not refer to that single statement later in the trial. Instead, much of the closing arguments focused on aspects of the case that were unrelated to Peters's testimony. *Cf. Walker*, ¶ 49 (discerning no plain error in prosecution's allegedly improper remarks because, among other things, they were fleeting). Additionally, defense counsel's failure to object to the testimony at issue indicates counsel's belief that the testimony was not overly

11

damaging.  *See Domingo-Gomez v. People*, 125 P.3d 1043, 1054 (Colo. 2005).

¶ 26 Consequently, we conclude that none of the alleged errors requires reversal.

## 2. Testimony of Linda Mikow

¶ 27 Flores contends that Linda Mikow's testimony about S.C.'s forensic interview impermissibly opined that S.C.'s allegation was true.  We disagree.

¶ 28 The prosecution endorsed Mikow as an expert in forensic interviewing, Flores did not object, and the court accepted her as such.  Mikow explained that she did not conduct the interview of S.C. but that she was familiar with the case.  Mikow discussed the general structure of a forensic interview and explained how her organization follows the "best practices" and standards for forensic interviews as established by the National Children's Alliance.

¶ 29 Mikow identified some guidelines for conducting a forensic interview.  She said interviewers typically tell children to let them know if they do not understand a question, not to guess if they do not know an answer to a question, and to correct the interviewer if the interviewer makes a mistake.  Mikow also testified that she

reviewed the interview conducted with S.C. and that the interview was consistent with the training provided by the Colorado Children's Alliance.

¶ 30     On cross-examination, defense counsel asked Mikow if a second interview is conducted in cases where there is a problem with the initial interview.  The prosecutor objected, noting that no second interview occurred here and arguing that this line of questioning could "open[] the door to commenting on credibility of a particular interview."  The prosecutor said that, depending on Mikow's answers, he may have to ask if anything occurred in S.C.'s interview that would suggest a follow-up interview was necessary.  The court overruled the objection, noting that the prosecutor could have redirect examination.  Defense counsel then elicited Mikow's testimony that a law enforcement officer, not the forensic interviewer, would decide whether problems existed with the initial interview such that a second interview was necessary.

¶ 31     On redirect, the prosecution asked Mikow if S.C. had asked clarifying questions (correcting the interviewer) during the interview.  Mikow said S.C. had done so.  The prosecutor then asked are "those the types of things you want to see from a person as you're

conducting the interview?" Mikow responded "yes, it is." Mikow then testified that she was not familiar with a reason why a second interview would have been conducted in this case and the interview she reviewed complied with the pertinent training.

¶ 32 Flores argues that Mikow's testimony that correcting the interviewer is something she would "want to see" during a forensic interview impermissibly opined that S.C. that was telling the truth during the interview. For two reasons, we disagree: (1) Flores, despite the prosecutor's objection, opened the door to evidence of Mikow's view on whether there were problems with the forensic interview, including Mikow's view on the appropriateness of S.C.'s responses to questions, *see People v. Cohen*, 2019 COA 38, ¶¶ 21-26 (explaining the opening the door concept); and (2) Mikow's statements merely clarified that the behaviors she observed during S.C.'s interview — specifically, S.C.'s correcting the interviewer — were in line with what Mikow would expect in a forensic interview. Mikow's statements neither directly nor implicitly addressed the veracity of S.C.'s statements.

## C. Lay Witness Testimony

¶ 33 Flores contends that the trial court erred by admitting certain testimony from S.C.'s family members because it improperly expressed their opinion that S.C. was telling the truth about the charged incident. We are not convinced.

¶ 34 On direct examination, the prosecutor asked S.C.'s mother about the night S.C. first alleged the assault. Her mother said she talked to S.C. about the allegations to make sure that S.C. understood their serious nature. Her mother said S.C. become emotional. The prosecutor asked about S.C.'s demeanor when discussing the allegations. Her mother testified that S.C. was "very serious" and "very straight-forward and confident with her answer."

¶ 35 The prosecution also called S.C.'s brother, who testified that he asked S.C. on multiple occasions if the assault "really happened." The prosecutor asked her brother about S.C.'s demeanor during these conversations. Her brother testified that S.C. was "very serious, matter of fact" and that she would "make eye contact and say yes" when asked if the incident happened.

¶ 36 Contrary to Flores's assertion, neither S.C.'s mother nor brother testified that she told the truth in her allegation against

15

Flores. They simply commented on her demeanor during her reporting of the allegation, a permissible factor for the jury to consider when assessing her credibility. *See People v. Constant*, 645 P.2d 843, 846 (Colo. 1982); *People v. Sandoval*, 709 P.2d 90, 92 (Colo. App. 1985) (noting the prosecution could ask the child victim of sexual assault whether she had vomited before coming into the courtroom because it related to the victim's credibility). Indeed, the jury instructions in this case advised the jury that it may consider demeanor in assessing a person's credibility. *See Constant*, 645 P.2d at 846 ("[E]ven though 'demeanor' is not technically evidence, the jury is not only permitted but also affirmatively instructed to consider it in assessing witness credibility."). Unlike in *Cernazanu*, ¶ 16, neither witness testified that S.C. did not engage in her "typical lying behavior." Both her mother and brother simply addressed her general demeanor, not the sincerity of her allegation.

¶ 37 Consequently, we conclude that the trial court did not err.

### III. Alleged Prosecutorial Misconduct

¶ 38 Flores contends that the trial court erred by allowing prosecutorial misconduct. Specifically, he argues that the court allowed the prosecutor to (1) ask questions during voir dire that

16

improperly "indoctrinated" the jurors to the prosecution's theory of the case; (2) elicit the testimony discussed in Part II of this opinion; (3) ask questions during cross-examination of witnesses that displayed the prosecutor's personal opinion that Flores was guilty; and (4) engage in improper closing arguments. We disagree.

¶ 39    "In reviewing a claim of prosecutorial misconduct, 'we consider whether the prosecutor's conduct was improper and whether any impropriety requires reversal.'" *People v. Garcia*, 2022 COA 144, ¶ 56 (citation omitted). "Whether a prosecutor's statements constitute misconduct is generally a matter left to the trial court's discretion." *Id.* Accordingly, we will not disturb the court's rulings on alleged misconduct absent an abuse of discretion. *People v. Strock*, 252 P.3d 1148, 1152 (Colo. App. 2010).

¶ 40    Flores did not object to most of the prosecutor's comments that he challenges on appeal. When a claim of error is not preserved, our review is quite limited — we may reverse only if plain error occurred. *Hagos*, ¶ 14. To constitute plain error, prosecutorial misconduct must be "flagrantly, glaringly, or tremendously improper." *People v. Dominguez-Castor*, 2020 COA 1, ¶ 86 (citation omitted).

17

¶ 41    We have examined Flores's contentions that the trial court improperly permitted prosecutorial misconduct, and we conclude that none shows that the court committed reversible error.

¶ 42    First, the prosecutor's questions during voir dire — to which Flores did not object — simply sought to assess whether the prospective jurors possessed biases or beliefs that might prevent them from acting fairly and applying the law. *See People v. Collins*, 730 P.2d 293, 300 (Colo. 1986) ("The purpose of voir dire examination is to enable counsel to determine whether any prospective jurors are possessed of beliefs which would cause them to be biased in such a manner as to prevent the counsel's client from obtaining a fair and impartial trial."); *Garcia*, ¶ 18 (same). In context, the prosecutor's questioning could be fairly understood as exploring whether, absent physical evidence and third-party eyewitnesses, the jury could still find a defendant guilty beyond a reasonable doubt if the jury believed the complaining witness. That reflects an accurate understanding of the law, so the prosecutor's attempt to discover whether jurors could apply this law was not improper. *See People v. Salazar*, 2023 COA 102, ¶ 51 ("The premise of the prosecutor's arguments was that the jury should convict

Salazar if the jury believed the victims.  And it is true that, if the jury believed the victims, Salazar committed sexual assault on a child."); *People in Interest of J.R.*, 2021 COA 81, ¶ 54 (discerning no error in the statement that "you're going to find [the victims] credible, and when that happens, they will be vindicated and you will hold [the defendant] accountable").

¶ 43    Although Flores relies almost exclusively on out-of-state decisions to support his challenge to the prosecutor's voir dire questions, we do not rely on those decisions because Colorado authority is sufficient.  At any rate, those out-of-state decisions could not establish that the trial court here committed *obvious* error by not intervening sua sponte to address the prosecutor's questioning.  *See Walker*, ¶ 68 (recognizing that prior *Colorado* case law bears on the obviousness analysis).

¶ 44    Second, we have concluded that the testimony discussed in Part II of this opinion either was admissible, was not obviously inadmissible, or was not substantially prejudicial.  Consequently, we further conclude that the trial court did not reversibly err by permitting the prosecutor to elicit this evidence, especially given that defense counsel expressed no objection to it.

¶ 45    Third, we are unpersuaded by Flores's contention that the prosecutor, during cross-examination of witnesses, impermissibly communicated a personal belief that S.C. was credible by asking whether the witnesses were aware of S.C.'s detailed allegations or had seen S.C.'s forensic interview.  The prosecutor was permitted to ask the witnesses about the basis for their testimony because it bore on their credibility.  And to the extent Flores challenges some of the prosecutor's questions to him about S.C.'s delayed accusations, we note that Flores objected and the trial court sustained the objections.  Because Flores did not ask for further relief, we discern no error.  *See People v. Douglas*, 2012 COA 57, ¶ 65; *Mingo v. People*, 468 P.2d 849, 851 (Colo. 1970).

¶ 46    Finally, we reject Flores's contention that the prosecutor engaged in obvious and substantial misconduct in closing arguments.  On this issue, we reason as follows:

- The prosecutor's argument that the evidence did not support Flores's defense theory was not improper, *see Walker*, ¶ 41; regardless, the trial court sustained an objection to it, and Flores did not seek other relief.

- The prosecutor's argument recalling S.C.'s testimony that she was "not making this up" and her brother's description of her demeanor when she disclosed the allegations to him were not improper because that testimony was admissible. *See People v. McGrath*, 793 P.2d 664, 667 (Colo. App. 1989) (noting that, where evidence is admitted at trial, the prosecutor may properly comment on it during closing).

- The prosecutor's statements that he had changed the date range of the alleged crime based on new information and that the prosecutor's office had discovered photographic material supporting the allegations were not misconduct. The prosecutor did not assert or imply that he personally believed S.C.'s allegations; he argued that the evidence supported the amended date range.

- The prosecutor did not unduly appeal to the jury's sympathy by arguing that S.C. "had the strength to come in here, in front of all you strangers, in this uncomfortable environment, to tell you what happened." A prosecutor may use "oratorical embellishment" in

closing argument. *See Salazar*, ¶¶ 48-52 (finding no plain error in more dramatic and inartful prosecutorial arguments); *J.R.*, ¶¶ 48-50 (holding that the prosecutor did not commit misconduct by arguing that "testifying about sexual abuse was hard for young children" because the argument reflected "everyday experience and common sense").

¶ 47 For all these reasons, "we conclude that the prosecutor's conduct 'does not warrant the drastic remedy of reversal under the plain error standard.'" *Salazar*, ¶ 53 (citation omitted).

## IV. Cumulative Error

¶ 48 Flores contends that the alleged errors in this case, when considered cumulatively, denied him a fair trial. "When reviewing for cumulative error, we ask whether 'numerous formal irregularities, each of which in itself might be deemed harmless, may in the aggregate show the absence of a fair trial.'" *People v. Vialpando*, 2022 CO 28, ¶ 33 (quoting *Howard-Walker v. People*, 2019 CO 69, ¶ 24). To reverse under this doctrine, we must conclude that "the cumulative effect of [multiple] errors and defects substantially affected the fairness of the trial proceedings and the

22

integrity of the fact-finding process." *Howard-Walker*, ¶ 24 (citation omitted).

¶ 49    Because we have rejected most of Flores's assertions of error, and because the other alleged errors were not substantial, we conclude that, even in the aggregate, the asserted errors do not show the absence of a fair trial. *See, e.g.*, *People v. Wise*, 2014 COA 83, ¶ 31 ("As is often said, a defendant is entitled to a fair trial, not a perfect one.").

## V.    Conclusion

¶ 50    The judgment is affirmed.

JUDGE DUNN and JUDGE GOMEZ concur.